IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAMMIE MANLEY, | ) | CASE NO. 4:18CV1431 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| LESTER HUGHES, *et al*., | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

*Pro se* Plaintiff Rammie Manley ("Manley") filed a Complaint alleging that Defendants Lester Hughes, Michael Filipowicz, Joshua Hall, Jarrod Seech, Waylon Wine, Dennis Shannon, Milton Williams, Tamra Dotson, Michael Stevens, and Michael Robinson (collectively "Defendants"), all correctional officers employed at the Ohio State Penitentiary, violated his Eighth Amendment right to be free from cruel and unusual punishment. Doc. 1, pp. 6-8; Doc. 10, p. 3. Manley complains that Defendants used OC spray and shot pepper balls into his cell before they set off a stinger grenade, entered his cell, and forcibly extracted him. He alleges that, while he was handcuffed behind his back and in leg irons, officers escorted him to the Receiving and Discharge ("R&D") decontamination area; during the escort, an officer grabbed his finger and dislocated it. Doc. 1, p. 7.

Defendants moved for summary judgment, arguing that the evidence contradicts Manley's claim that he was assaulted in his cell or that any officer dislocated his finger while escorting him. Manley did not file an opposition brief. To the extent Manley asserts any constitutional violation for the officers' conduct leading up to and including extracting him from his cell, the Defendants are entitled to summary judgment because the force they used was necessary to maintain or restore discipline. However, Defendants have not met their burden to

1

show there is no genuine issue of material fact as to whether three officers—Williams, Shannon, and/or Filipowicz—dislocated Manley's finger after he was extracted from his cell and while they were escorting him to R&D. Accordingly, those officers are not entitled to qualified immunity or summary judgment on that claim, although the remaining Defendants are entitled to summary judgment. Thus, for the reasons explained more fully below, Defendants' Motion for Summary Judgment should be **GRANTED** in part and **DENIED** in part.

### I. Background

Manley alleges that, while in his prison cell on December 21, 2017, he wanted to speak to a lieutenant or sergeant. Doc. 1, p. 6 (Complaint). So he lied and told Defendant Correctional Officer Joshua Hall that he had razors in his cell. Doc. 1, p. 6; Doc. 31-2, p. 17 (Manley deposition). This did not have the effect Manley desired; rather than sending a lieutenant or sergeant to speak to Manley, a negotiator was sent to his cell to convince Manley to give up the razors. Doc. 1, p. 6; Doc. 31-6, p. 2, ¶13 (Hughes Declaration). Manley refused to cooperate with the negotiator. Doc. 1, pp. 6-7. This prompted Correctional Officer Lester Hughes (a lieutenant), accompanied by Correctional Officers Hall, Jarrod Seech, Michael Stevens, and Tamra Dotson, who was recording the events, to go to Manley's cell and order him to "cuff up," *i.e.*, permit himself to be handcuffed. Doc. 31, p. 17; Doc. 31-6, pp. 1, 2, ¶¶2, 15; Doc. 31-2, p. 18. Hughes warned Manley that, if he did not comply with his order to cuff up, Hughes would spray OC in his cell.[1] Doc. 31, p. 17; Doc. 31-6, p. 2, ¶15. The reason Hughes ordered him to cuff up was so that the officers could search his cell to check for razors. Doc. 31-2, p. 19. Manley refused to cuff up.

Because Manley refused to cuff up, Hughes sprayed OC in his cell and continued to order him to cuff up. Doc. 31-2, p. 19; Doc. 31-6, p. 3, ¶19. Manley still did not comply with

---

[1] "OC" is an acronym for oleoresin capsicum, the active ingredient in pepper spray. *See Harrison v. Gregg*, 2013 WL5353188, at * 2 (N.D.Ohio Sept. 24, 2013).

2

Hughes's orders to cuff up.  Doc. 31-2, p. 19.  Because Manley did not comply with Hughes's orders after Hughes sprayed OC into his cell, Hughes used a pepper ball launcher to launch a pepper ball into his cell.  Doc. 31-2, p. 20; Doc. 31-6, p. 3, ¶22.  Pepper balls are more potent than OC spray and designed to make it difficult for the inmate to see.  Doc. 31-2, p. 20; Doc. 31-6, p. 3, ¶22.  The parties agree that, when an inmate does not comply with correctional officers' orders despite the use of OC spray, officers will then use pepper balls to attempt to get the inmate to comply with orders.  Doc. 31-2, p. 21; Doc. 31-6, p. 3, ¶22.  Hughes continued to shoot pepper balls into Manley's cell and Manley continued to resist orders to cuff up.  Doc. 31-6, p. 3, ¶24; Doc 31-2, p. 29.

All told, Hughes shot nine pepper balls into Manley's cell.  Doc. 31-6, p. 3, ¶26.  Manley still did not comply with Hughes's orders to cuff up.  Doc. 31-2, p. 29.  Because Manley still did not comply with Hughes's orders, an extraction team was assembled, comprised of Defendant Correctional Officers Milton Williams, Dennis Shannon, Michael Filipowicz, Hall, and Seech.  Doc. 31-6, p. 3, ¶¶26-27; Doc. 31-7, p. 4, ¶35. (Hall Declaration).  Hughes was joined by Officers Waylon Wine and Dotson (who was still recording); they and the team returned to Manley's cell and Hughes ordered Manley to cuff up.  Doc. 31-14, p. 3, ¶18.  Manley refused.  A stinger grenade, used as a distraction to allow the team to enter, was shot into Manley's cell and the team entered his cell to forcibly extract him.  Doc. 31-6, p. 4, ¶¶28; Doc. 31-2, p. 29.

Manley alleges that the officers came into his cell "swinging."  Doc. 1, p. 7.  He fought the officers.  Doc. 31-2, pp. 30-31.  He did not stop fighting until the officers had him on the ground, because he knew that, at that point, there wasn't much more he could do.  Doc. 31-2, p. 32.  The officers handcuffed Manley with his hands behind his back, placed leg irons on him, and removed him from his cell.  Doc. 31-2, p. 33.  Manley affirmatively testified in his deposition that he did not receive any lasting injuries up to this point.  Doc. 31-2, pp. 29, 32.  He

3

reported the OC spray caused irritated skin that was "peeled pink" for a few weeks; his vision and hearing was "messed up" temporarily from the stinger grenade; and, from the extraction, "a little bruising, but nothing serious." Doc. 31-2, pp. 26, 29-30, 32-33.

Hughes, Wine, the extraction team (Williams, Shannon, Filipowicz, Hall, and Seech), and Dotson (filming) proceeded to escort Manley to "R&D," which is a decontamination area in the basement of the prison. Doc. 1, p. 7; Doc. 31-2, pp. 35-36. It is a long walk from Manley's cell to R&D and involves an elevator ride and turns down a few hallways. Doc. 31-2, p. 36. According to Defendants, during the officers' escort of Manley to R&D, Officer Shannon held Manley's left arm, Officer Williams held his right arm, and Officer Filipowicz followed closely behind. Doc. 31-9, p. 3, ¶36. These are the only correctional officers who had contact with Manley during the escort to R&D; all the other officers followed further behind without making contact with Manley. Doc. 31-9, p. 3, ¶36. Manley stated that, while he was in the elevator, he felt an officer "trying to grab my finger, which is something they never do." Doc. 31-2, p. 37. After they got out of the elevator, they walked down two hallways, and when they were walking around a corner "they finally got …. ahold of my finger and dislocated it." Doc. 31-2, p. 37.

Defendants moved for summary judgment, arguing that there is no genuine issue of material fact that Defendants' actions— shooting OC spray, pepper balls, and a stinger grenade into Manley's cell and extracting him— were proper; and that no officer intentionally harmed Manley's finger during the escort to R&D. Doc. 31, p. 8. Manley did not file an opposition brief. In his Complaint, Manley references a video recording of the events in which, he claims, you can hear his finger being broken as the officers escorted him to R&D. Doc. 1, p. 7. Defendants also rely on this video, which was recorded by Officer Dotson, and which they filed as an exhibit in support of their motion.[2]

---

[2] Defendants manually filed the video evidence with the Clerk's Office.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotations omitted).

Once the moving party has met its burden, the non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256; *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248. "Inferences supported by the record, including [a] video, remain drawn in favor of the non-moving party." *Oliver v. Greene*, 613 Fed. App'x 455, 457 (6th Cir. 2015) (citing *Scott v. Harris*, 550 U.S. 371, 381 n.8 (2007)).

Manley did not file an opposition brief. However, the initial burden remains with Defendants to show that there is an absence of evidence to support Manley's claims. *Celotex Corp.*, 477 U.S. at 325. If Defendants cannot meet this burden, they are not entitled to summary judgment despite Manley's failure to file an opposition brief. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) (if the movant fails to satisfy its burden on summary judgment, the non-movant is "not required to come forward" with opposing evidence, citing a Fed.R.Civ.P. 56(e) Advisory Committee comment); *Alexander v. F.B.I.*, 691 F.Supp.2d 182, 193 (D.D.C. 2010) (failure of plaintiff to file an opposition brief does not absolve the moving party from meeting its initial burden; "even where a summary judgment motion is unopposed, it is only properly granted when the movant has met its burden[,]" citing *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 949-450 (9th Cir. 1993)).

### III. Analysis

Manley, a prison inmate, has a constitutional right to be free from the use of excessive force by prison officials under the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 318-319 (1986); *Perkins v. Alexander*, 2009 WL 3489908, at *4 (N.D.Ohio 2009) (the Eighth Amendment sets the standard for an excessive force claim alleged by a convicted prisoner). The "core judicial inquiry" when a prison official is accused of using excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); citing *Whitley*, 475 U.S. at 320–21). A court considers "the extent of injury suffered by an inmate, . . . the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

"[E]very malevolent touch by a prison guard" does not give rise to a federal cause of action. *Id*. at 9. The Eighth Amendment does not apply to *de minimis* uses of physical force that are not "repugnant to the conscience of mankind." *Id*. at 9-10 (citations omitted). "The maintenance of prison security and discipline may often require that prisoners be subjected to physical contact which at common law would be actionable as an assault or battery and which, in retrospect, may have been excessive. But, the good faith use of physical force in pursuit of valid penological or institutional goals will rarely, if ever, violate the Eighth Amendment." *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986) (citing *Whitley*, 475 U.S. 312; *Rhodes v. Chapman*, 452 U.S. 337, 346, (1981)); *Kinley v. Davis*, 772 F.2d 907, at *2 (6th Cir. 1985) (table decision) ("prison officials are given wide ranging deference in the execution of policies needed to preserve internal order and maintain security," citing *Bell v. Wolfish*, 411 U.S. 520, 547 (1979)).

### A. The evidence considered by the undersigned

As set forth above, Manley's failure to file an opposition brief, alone, does not entitle Defendants to summary judgment. *See Celotex Corp*., 477 U.S. at 325; *Adickes*, 398 U.S. at 160; *Alexander*, 691 F.Supp.2d at 193. Manley's Complaint does not constitute evidence of record because it is not a verified complaint, *i.e.*, it lacks an assertion that the statements within it were made under the penalty of perjury. *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (a verified complaint carries the same weight as an affidavit for the purposes of summary judgment if it is signed under penalty of perjury pursuant to 28 U.S.C. § 1746 (citing *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993)).

Defendants filed, and cite to, Manley's deposition testimony. Manley's deposition testimony is evidence in the record that the Court properly considers on a motion for summary judgment, even if Manley did not file it or rely upon it himself. *See, e.g., Sloane v. Getz*, 150 Fed. App'x 86 (2d Cir. Oct. 6, 2005) (reversing district court grant of summary judgment to

defendant prison officials on an excessive force claim when the *pro se* prisoner failed to file an opposition brief, finding that the court erred when it ignored the plaintiff's deposition testimony that was filed by the defendants and that created a material issue of fact); *Meyer v. AmeriSourceBergen Drug Corp.*, 2006 WL 2164713, *2-5 (N.D.Ohio July 31, 2006) (plaintiff did not file a brief in opposition to the defendant's motion for summary judgment; the district court cited case law indicating a court is still obligated to consider the merits on the record before it and went on to consider the merits, including the plaintiff's deposition transcript filed by the defendants, and granted in part and denied in part the defendant's motion).

In sum, the record evidence considered by the undersigned includes Manley's deposition testimony, and other evidence relied upon by Defendants, which is described in greater detail below.

### B.  Defendants' actions prior to escorting Manley to R&D did not violate his Eighth Amendment rights

To the extent Manley alleges that Defendants' actions prior to escorting him to R&D violated his Eighth Amendment rights, Defendants are entitled to summary judgment on such a claim.

During his deposition, Manley admitted that he told Officer Hall that he had razors in his cell and that doing so set off the events that followed.[3]  Doc. 31-2, pp. 17-18.  As a result of his statement to Hall that he had razors in his cell, Officer Hughes, who is a lieutenant, came to his cell and ordered him to cuff up.  Doc. 31-2, pp. 17-18; Doc. 31-6, p. 1, ¶2.  Manley did not comply.  Doc. 31-2, pp. 18-19.  Hughes then assembled a team and sprayed OC spray into Manley's cell and again ordered him to cuff up.  Doc. 31-2, p. 19.  Manley continued to disobey

---

[3] Inmates are not allowed to have razors in their cell for security reasons.  See, e.g., Doc. 31-6, p. 2, ¶¶11-12 (Officer Hughes's Declaration).  Manley stated that he lied to Officer Hall about having razors in his cell.  Doc. 31-2, pp. 17-18.  Correctional Officer Stevens stated that he found razors in Manley's cell after Manley had been extracted.  Doc. 31-10, p. 3, ¶25 (Stevens' Declaration).  This factual dispute is not material because Manley does not challenge Defendants' reason for ordering him to cuff up.

8

Hughes's orders and took steps to slow the effects of the OC spray on him by covering his face with a towel or clothing.  Doc. 31-2, p. 19.  He knew that the next step would be pepper balls shot into his cell, which Hughes did shoot into his cell, and yet he still did not comply with orders to cuff up.  Doc. 31-2, p. 29.  He admits that he had no good reason for not complying with Hughes's orders to cuff up.  Doc. 31-2, pp. 19 ("I really have no good answer for that.  I just didn't."), 29 (when asked why he did not comply with orders after the officers shot pepper balls into his cell, Manley stated, "Stubborn.").  When a stinger grenade was launched into his cell and the team entered to extract him, he fought them:

> Q:  Okay.  And so when they came into your cell, at that time did you comply and agree to be cuffed up?
>
> A:  No.
>
> Q:  Okay.  And what happened?
>
> A:  I stepped aside from the first officer 'cause I didn't want to get rammed with the shield, the shield that they have.  Basically the inside is covered in mace, the OC that they spray into your cell.  They use it to block you from coming back out or to block you from retaliating or throwing something or trying to harm the officers.  So I sidestepped that.  So, and usually it's a wrestling match to get you to the ground.  They all have jobs.  Each one grab a certain part of your body.  But that's not how they started with the officer striking me with the elbow, and that's when I retaliated with the same force.
>
> Q:  Okay.  Did you -- you punched, you tried to punch one of the officers who was entering the cell?
>
> A:  Yes.
>
> ***
>
> Q:  So, but you did struggle with them?
>
> A:  Yes.

Doc. 31-2, pp. 30-32.

The above-described acts of Defendants did not violate Manley's Eighth Amendment rights.  The use of OC spray, pepper balls, a stinger grenade, and the officers' extraction of him from his cell were all used in a good-faith effort to maintain or restore discipline when Manley

9

disobeyed orders to cuff up after he told officers that he had razors in his cell; it was not done to maliciously and sadistically cause harm. *Hudson*, 503 U.S. at 7; *Brown v. Perez*, 2017 WL 3378994, at *1-2 (6th Cir. Apr. 17, 2017) (no Eighth Amendment violation when, upon receiving a kite from a prisoner indicating that he was planning to harm himself, correctional officers went to the prisoner's cell and ordered him to cuff up; the prisoner denied he sent the kite and refused the officers' orders; the officers sprayed tear gas in his cell and prisoner still refused to obey orders to cuff up; and officers then entered his cell and forcibly extracted him). Furthermore, Manley's injuries were not serious. *See Hudson*, 503 U.S. at 7 (A court considers the extent of injury suffered by an inmate); Doc. 31-2, p. 26-28 (Manley describing skin irritation and peeling that lasted for weeks); *Brown*, 2017 WL 3378994, at *2 (finding that the chemical agent that caused the prisoner's skin to burn for weeks was a temporary injury that did not rise to the level of an Eighth Amendment violation).

Defendants are entitled to summary judgment on this claim.

**C. Officers Filipowicz, Williams and/or Shannon have not met their initial burden to show no genuine issue of material fact as to whether they used excessive force that caused a serious injury to Manley while escorting him to R&D**

**1. Manley's injury was serious, indicating use of force was not *de minimis***

Manley alleges that, while he was being escorted to R&D, the officers "got ahold of" his left index finger and dislocated it.[4] Doc. 1, p. 7; Doc. 31-2, pp. 36-37. At his deposition, he explained that, while he was riding in the elevator with the officers while handcuffed and in leg irons, an officer was "grabbing at my finger…" Doc. 31-2, p. 37. After exiting the elevator,

> [They] kept trying to grab my finger, and then when we went around the corner, they finally got—I don't know who that's why I say that, 'cause I don't really know which

---

[4] Defendants take issue with the fact that Manley often described his finger as "broken" and submits that it was "only dislocated." Doc. 31, p. 20. While true that Manley used the word "broken" in his Complaint and often used the words "broken" and "dislocated" interchangeably during his deposition, this distinction is not material. Manley's finger was "disfigured," a bone had broken through the skin, and it was initially assessed by medical staff as "broken." Doc. 31-5, pp. 1, 4, 19, 22. In short, the fact that Manley sometimes said "broken" instead of "dislocated" does not change the nature of his injury or the outcome of this case.

10

>officer did it—but got around the corner and officers finally got ahold of my finger and dislocated it.

Doc. 31-2, p. 37. He alleges that, once he was placed in a cell in R&D, he was seen by a nurse who noted the blood dripping from his hand onto the ground and that his left pointer finger was disfigured. Doc. 31-2, p. 40. He was taken to the emergency room, where his finger was relocated and the laceration was sutured. Doc. 31-2, p. 40. He states that he is left-handed and that he is unable to completely close his left index finger and experiences pain when he tries to squeeze something. Doc. 31-2, pp. 27, 42-43.

Medical records submitted by Defendants confirm that, upon arrival in R&D, Manley's finger was deformed and bleeding. Doc. 31-5, pp. 1, 6, 19. The attending prison nurse initially assessed his finger as broken and wrapped his hand with gauze to "help with the bleeding" before calling the prison doctor. Doc. 31-5, p. 1. Manley was then taken to a hospital emergency room, where he was initially assessed as having an open fracture; x-rays revealed it was not a fracture but a dislocation. Doc. 31-5, pp. 19, 21. His finger was relocated, his wound was sutured, a hard cast was placed on his hand, and he was diagnosed with an open dislocation of the interphalangeal joint of his left index finger. Doc. 31-5, pp. 6-7, 21, 22. Defendants do not dispute that Manley suffered a dislocated finger that broke the skin and bled.

An Eighth Amendment violation will not be found when a "*de minimis* use of physical force" is applied, "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (quoting *Hudson*, 503 U.S. at 9-10). "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id*. Defendants do not challenge that Manley's injury was severe, which suggests that the force used was more than *de minimis*. The undersigned finds that Manley's open dislocation of his left index finger is a serious injury

11

suggesting that the force used was not *de minimis*. And, as described more fully below, if Manley's injury occurred the way he alleges, the offending officer's use of force would be excessive.

### 2. There is an issue of fact as to whether Manley's finger was dislocated when he was escorted to R&D

Defendants claim that no officers admit to dislocating Manley's finger or seeing any other officer dislocate his finger. Therefore, they state, any injury Manley suffered "had to have occurred during his cell extraction, when he fought the officers." Doc. 31, p. 9. In support, they rely on Manley's deposition, the officers' declarations, and a video recording of the events taken by Officer Dotson. Doc. 31, pp. 20-23.

#### a. The officers' declarations

Defendants admit, and the record shows, that eight officers escorted Manley to R&D: Williams, Shannon, Filipowicz, Hughes, Hall, Seech, Wine, and Dotson (who was operating the video camera).[5] They allege that only three of them had contact with Manley during the escort: Officer Shannon "had physical contact with [his] left arm," Officer Williams "held onto [his] right arm," and Officer Filipowicz "had physical contact with Manley during the escort." Doc. 31, p. 21; Doc. 31-17, p. 2, ¶15 (Shannon declaration); Doc. 31-11, p. 2, ¶18 (Williams declaration); Doc. 31-9, p. 3, ¶26 (Filipowicz declaration). Williams and Shannon denied "intentionally" hurting or dislocating Manley's finger. Doc. 31-11, p. 3, ¶23; Doc. 31-17, p. 3, ¶19. Filipowicz denied hurting or dislocating Manley's finger. Doc. 31-9, p. 4, ¶32. The remaining five officers deny seeing any officer hurt or dislocate Manley's finger.[6] Defendants submit that this evidence "contradicts" Manley's deposition testimony that his finger was

---

[5] See Doc. 31-6, p. 4, ¶33 (Hughes Declaration); Doc. 31-7, p. 5, ¶45 (Hall Declaration); Doc. 31-8, p. 4, ¶34 (Seech Declaration); Doc. 31-14, pp. 3-4, ¶¶26-27 (Wine Declaration); Doc. 31-13, p. 4, ¶¶33-35 (Dotson Declaration).

[6] See Docs. 31-6, p. 4, ¶35 (Hughes); 31-7, p. 5, ¶47 (Hall); 31-8, p. 4, ¶37 (Seech); 31-14, p. 4, ¶28 (Wine); 31-13, p. 4, ¶25 (Dotson).

dislocated by an officer while he was being escorted to R&D. Doc. 31, p. 21. The undersigned agrees that Defendants' declarations "contradict" Manley's account; and finds that the contradictory evidence shows that there is a factual dispute over whether one or more officers dislocated Manley's finger when escorting him to R&D. Manley says they did; Defendants say they did not. If one or more officers dislocated Manley's finger while escorting him to R&D it would constitute excessive force because it was not done in a good-faith effort to maintain or restore discipline, but maliciously and sadistically in order to cause harm.[7] *Hudson*, 503 U.S. at 7.

### b. The video recording[8]

Defendants also rely on the video recording made by Officer Dotson which, they allege, "corroborates the officer's [sic] account of the escort." Doc. 31, p. 23. But the video recording does not support Defendants' position for the simple reason that Officer Dotson was well behind Manley at all times and her recording mostly shows the backs of seven correctional officers; it does not show Manley.[9]

If anything, the video corroborates Manley's description of events. The video shows Manley being escorted while handcuffed behind his back and with leg irons on. (Video #3, at 04:37-04:39). After a very crammed ride in an elevator (the camera shows only the backs and sides of officers (06:00-06:40)), Manley is escorted out of the elevator. The officers escorting him are in the lead and they take a turn to the left; here, for a moment, one can see that Manley's

---

[7] Defendants do not argue that Manley became unruly and required discipline during the escort to R&D; rather, they speculate that Manley injured his finger when he fought the officers during the extraction procedure. Doc. 31, p. 9.

[8] Defendants submitted two discs to the Court that contain the video recording broken down into three separate parts. The first two parts show the officers interacting with Manley while he is in his cell. The third part shows the officers' extraction of Manley from his cell and the walk to R&D. The Court only cites to the third part of the video and hereinafter refers to the third part of the video as "Video #3."

[9] Officer Dotson stated, "I was no more than a couple feet behind Manley during the escort." Doc. 31-13, p. 4, ¶33. Dotson's assertion is belied by the video recording, which shows her far more than "a couple feet" behind Manley during the escort, with the exception of the time spent in the elevator. See Video #3, at 04:46-09:00.

13

upper body and head is bent forward almost to waist level with his face pointed towards the ground (06:46); *see also* Doc. 31-2, p. 34 (Manley's deposition). As they proceed down the hallway, the video shows only the backs of the officers following behind those escorting Manley. As the officers escorting Manley (still in the lead) begin to veer to the right to go around a countertop, one can see that the officers are walking in a loose single file line behind Shannon on Manley's left side, Williams on his right side, and Filipowicz very close behind Manley between Shannon and Williams. One cannot see Manley, only the backs of Shannon, Williams, and Filipowicz. Suddenly, Manley, who had been relatively quiet, can be heard emitting a loud groan (07:08). Briefly, one is able to glimpse Manley again; he is still being held in such a way that his head and upper body are bent forward almost to waist level with his face pointed towards the ground. Following his groan, Manley yells, "Ahhh…you broke my finger!" and continues to groan and again yells, "Oh my God, you broke my finger!" and groans some more (07:08-07:20).

> Defendants argue,
>
> The videotape of the escort, recorded by Defendant Dotson, corroborates the officer's account of the escort. The escort can be seen proceeding without incident. (Exhibit 16). Plaintiff can be heard making a statement about his finger during the escort, however, there is no sudden movement by any officer which precedes his statement, which would indicate that officer just reached over and intentionally broke Plaintiff's finger. *Id*. There is also no sudden movement by Plaintiff when he makes the statement about his finger. *Id*. If an officer had grabbed Plaintiff's hand and broken his finger during the escort, there would have been some physical reaction by Plaintiff: a sudden jerking or pulling away from the officers at the same time he made his statement. *Id*. Instead, Plaintiff merely gave a manufactured verbal response. *Id*.

Doc. 31, p. 23.

Defendants' contention is meritless for a number of reasons. First, the video recording does not provide a clear picture of Manley or the officers escorting him at any time, let alone the time he alleges Defendants dislocated his finger (07:08).[10] Thus, it cannot be determined from

---

[10] Officers Hughes and Wine are wearing white shirts, but all the other officers in the video are clothed in black and some are wearing black helmets. They move very closely together. The hallway is poorly lit. The video recording

14

watching the video precisely how the officers or Manley moved their bodies when Manley groans and then yells, "You broke my finger!" Second, it is unclear whether and to what extent an inmate handcuffed behind his back and wearing leg irons while being held and walked by three officers with his head and upper body bent forward almost to waist level is capable of "sudden jerking or pulling away." Thus, the fact that Manley did not allegedly suddenly jerk or pull away does not show he did not have his finger dislocated.[11] Finally, Defendants' assertion that the view of some of the officers' backs show that they did not move the way a person would move if he or she had dislocated another person's finger is not evidence. The Court declines to speculate as to what a person may look like from behind when dislocating another person's finger. This is a question for the jury.

As the Sixth Circuit reiterated when discussing a video submitted by a defendant prison guard in an excessive force case, "The problem for [the defendant] is that his record-supported evidence, including the videotape, does not 'blatantly contradict' [the plaintiff]'s description of what happened...." *Oliver v. Greene*, 613 Fed. App'x 455, 459 (6th Cir. 2015) (rejecting the defendant's contention that the court interpret video evidence in his favor, quoting *Carter v. City of Wyoming*, 294 Fed. App'x 990, 992–993 (6th Cir. 2008)). "Inferences supported by the record, including the video, remain drawn in favor of the non-moving party." *Id*. at 458 (citing *Scott*, 550 U.S. at 381 n. 8). Here, the video does not contradict Manley's version of events. Therefore, Defendants have not met their burden to show that there is an absence of a genuine issue of material fact as to whether Manley's finger was dislocated maliciously and sadistically to cause harm during his escort to R&D. *Hudson*, 503 U.S. at 7.

---

is taken from a considerable distance and is not of good quality. Thus, during much of the recording it is not possible to decipher the individual officers from each other, or, sometimes, even from shadows in the hallways.

[11] Based on what little can be discerned from the video recording, it does appear that Officer Shannon and/or Manley made some unusual movement when Manley yelled, "You broke my finger!" See Video #3, at 07:10.

### 3. Officers Williams, Shannon and Filipowcz are not entitled to summary judgment. The remaining Defendants are entitled to summary judgment.

In his Complaint, Manley does not identify the officer who he alleges dislocated his finger during his escort to R&D. In his deposition, he explains that he cannot identify the officer who dislocated his finger because he could not see who was escorting him. Doc. 31-2, pp. 34-35, 37, 61. And, as explained above, one cannot determine from watching the video whether and what officer may have dislocated his finger.

Although Defendants point out that Manley does not identify the officer he claims dislocated his finger, they do not state that they are entitled to summary judgment because of Manley's inability to identify the officer. Case law indicates that Manley's inability to identify the officer he claims dislocated his finger does not require a court to grant summary judgment to Defendants. *See, e.g., Fazica v. Jordan*, 926 F.3d 283, 292 (6th Cir. 2019) ("[W]here a plaintiff who was unable to identify clearly which officers committed specific acts during the incident produces evidence that places an individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence, the plaintiff's claim against that defendant may survive summary judgment."). Moreover, Defendants have identified the officers who had contact with Manley while escorting him to R&D: Williams, Shannon, and Filipowicz. These three officers were in a small group of eight total officers within each others' presence. *Id*. Thus, Manley's inability to identify the specific officer does not defeat his claim and Officers Williams, Shannon, and Filipowcz are not entitled to summary judgment because the dislocation of Manley's finger, which he alleges occurred when he was handcuffed and in leg irons, constituted excessive force.[12]

---

[12] Defendants assert that Manley specifically stated that Officer Williams did not violate his constitutional rights but was merely present. Doc. 31, p. 12. While true that, in his deposition, Manley stated that Williams did not violate his constitutional rights during the cell extraction procedure (Doc. 31-2, pp. 61-62), Manley did not make any statements absolving Officer Williams for acts committed during his escort to R&D.

16

Finally, to the extent that Manley alleges claims against the remaining officers for simply being "present" (Doc. 31-2, p. 54), such a claim fails. *See Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) ("mere presence during [an] altercation, without a showing of some direct responsibility, cannot suffice to subject [defendants] to liability[,]" citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). Accordingly, Officers Hughes, Hall, Seech, Wine, and Dotson are entitled to summary judgment because the evidence shows they were merely present during the escort to R&D. *Id*. The evidence shows that Officers Stevens and Robinson were not present during the escort to R&D (Doc. 31-10, p. 3, ¶24; Doc. 31-15, p. 2, ¶13); they, too, are entitled to summary judgment.

### D. Qualified Immunity

The doctrine of qualified immunity protects governmental officials performing discretionary functions from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a government official is entitled to qualified immunity, a court must decide whether the official violated a constitutional right and whether the right was clearly established. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (a court may use discretion in deciding which question to address first). When determining whether a right is clearly established, a court considers "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This analysis is "undertaken in light of the specific context of the case, not as a general broad proposition." *Saucier v. Katz*, 533 U.S. at 201-202 (*overruled in part on other grounds by Pearson*, 555 U.S. at 236). "The contours of the right must be sufficiently clear that

a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Defendants assert that they are entitled to qualified immunity. Doc. 31, p. 31. They argue that they used reasonable physical force when they extracted Manley from his cell after he disobeyed orders and after all other lesser force options were exhausted. Doc. 31, p. 32. They do not mention Manley's allegation that they used excessive force <u>after</u> he was extracted from his cell when an officer dislocated his finger while escorting him to R&D.

Because Manley has not shown that a constitutional violation occurred with respect to acts committed prior to and including his extraction from his cell, Defendants are entitled to qualified immunity on that claim. *See Saucier*, 533 U.S. at 201 (if the plaintiff cannot show the officer's conduct violated his constitutional right, the officer is entitled to qualified immunity). However, there is no qualified immunity with respect to Manley's claim that his constitutional rights were violated when an officer dislocated his finger while he was being escorted to R&D while handcuffed and in leg irons. That alleged force was unnecessary and a prisoner's right to be free of such excessive force was clearly established. *See Johnson v. Perry*, 106 Fed. App'x 467, 469 (6th Cir. 2004) ("[a]n unprovoked application of force to a handcuffed and shackled prisoner would violate clearly established law under the Eighth Amendment[,]" citing *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)); *Hudson*, 503 U.S. at 7. Thus, the officers who had contact with Manley during his escort to R&D (Officers Williams, Shannon, and Filipowicz) are not entitled to qualified immunity on that claim, although the remaining officers are.

18

## IV. Conclusion and Recommendation

For the reasons explained above, the undersigned recommends that Defendants' Motion for Summary Judgment (Doc. 31) be **GRANTED** as to Manley's claim against all Defendants for acts committed prior to and including his extraction from his cell; **DENIED** as to Defendants Williams, Shannon and Filipowicz as to Manley's claim an officer dislocated his finger during his escort to R&D; and **GRANTED** as to the remaining Defendants on this claim.


Dated:  October 31, 2019            */s/ Kathleen B. Burke*
                                                               Kathleen B. Burke
                                                               United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).